So Ordered.

Signed this 23 day of September, 2022.



_____

Diane Davis
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

_____

In re:

DONALD W. HALL,                          Chapter 7
                                         Case No.: 19-60278-6

                              *Debtor.*

_____

NANCY BRENNAN,

                           *Plaintiff*,        Adv. Pro. No.: 19-80011-6

v.

DONALD W. HALL,

                           *Defendant*.

_____

APPEARANCES:

MELVIN & MELVIN, PLLC                     ROGER W. BRADLEY, ESQ.

*Attorney for Plaintiff*
217 South Salina Street, 7th Floor
Syracuse, New York 13202

OFFICE OF MAXSEN D. CHAMPION             MAXSEN D. CHAMPION, ESQ.
*Attorney for Debtor-Defendant*
8578 East Genesee Street
Fayetteville, New York 13066

Honorable Diane Davis, United States Chief Bankruptcy Judge

1

## MEMORANDUM-DECISION AND ORDER

## INTRODUCTION AND PROCEDURAL BACKGROUND

Nancy Brennan ("Plaintiff") commenced this adversary proceeding against the debtor-defendant Donald W. Hall ("Defendant") (collectively, the "Parties") by filing a complaint on June 10, 2019 seeking to except from discharge a pre-petition debt owed to her in the sum of $39,036 pursuant to 11 U.S.C. §§ 523(a)(2) and (a)(6). (ECF Adv. No. 1, 42.)[1] Defendant filed his answer to Plaintiff's complaint on July 8, 2019 (ECF Adv. No. 4.), as well as a motion to dismiss Plaintiff's adversary complaint in its entirety on October 10, 2019. (ECF Adv. No. 9.) Plaintiff filed a reply to Defendant's motion to dismiss on November 12, 2019. (ECF Adv. No. 12.) The Court held a hearing on said motion on November 19, 2019, and by Order dated December 16, 2019, the Court dismissed the § 523(a)(6) action and preserved the § 523(a)(2) action. (ECF Adv. No. 15.) On December 15, 2020, the Court issued an Amended Scheduling Order setting a trial date for June 30, 2021. (ECF Adv. No. 31.) The Parties submitted their respective pretrial statements on June 21, 2021, and after trial, their respective post-trial briefs on July 28, 2021. (ECF Adv. No. 34, 35, 42, 44.) At the close of Plaintiff's case, Defendant's attorney moved to dismiss the matter on the basis that Plaintiff failed to carry her burden at trial. The Court reserved on Defendant's motion to dismiss. After consideration of the Parties arguments, evidence, documents, and testimony, the Court now makes the following findings of fact and conclusions of law as required by the Federal Rules of Bankruptcy 7052. For the reasons set forth below, the Court dismisses Plaintiff's § 523(a)(2) action in its entirety.

---

[1] Citations to dockets within the adversary proceeding will be as (ECF Adv. No. __.); Defendant's Chapter 7 bankruptcy will be as (ECF No. __.).

## JURISDICTIONAL STATEMENT

This adversary proceeding is a core proceeding over which the Court has jurisdiction pursuant to 28 U.S.C. §§ 157(a), (b)(1), (b)(2)(I), and 1334(b). Venue is proper pursuant to 28 U.S.C. § 1409(a).

## FACTS

The Court heard testimony from both Plaintiff and Defendant at trial, each of whom told different stories regarding their business relationship and the involvement of an individual named Larry Spencer ("Spencer"). It is therefore difficult to reconstruct a credible account of what transpired between the parties as the Court did not find one party's testimony more credible than the other party's testimony. Accordingly, the Court will summarize their respective testimony, keeping in mind Plaintiff carries the burden of proof. Plaintiff's counsel called two witnesses and offered nineteen exhibits into evidence. Defendant's attorney objected to exhibits 17 and 18, at which time the parties agreed that these exhibits would be used for impeachment purposes only. (Ex. 17-18). Defendant testified on his own behalf.

*Testimony of Plaintiff Brennan*

Plaintiff testified she has resided in Ponte Vedra, Florida since October 1, 2015 and that she is currently employed at Maxim Healthcare Agency. Plaintiff holds a Bachelor of Science in nursing, a Master's in Business Administration, and had a two-year fellowship in hospital administration. She also serves as president of the Council of Catholic Women in Jacksonville, Florida. (Trial Tr. 4-6.)

In April 2000, Plaintiff purchased her family home ("the Property") located at 1197 Hardscrabble Road, Fairfield, New York for $55,000. The Property was built in the nineteenth century, and contains a basement, kitchen, living room, bathroom, and dining room on the first

floor, and three bedrooms on the second floor. (Trial Tr. 6; ECF Adv. No. 1) Plaintiff made several

improvements to the Property prior to contacting Defendant, including having a new septic tank

installed for $5,000 in 2002, a new roof added for $5,000 in 2012, and repairs made to the cellar

wall for $7,500 in 2014. Plaintiff made these improvements because it was her intention to either

reside at the Property after retiring or to rent it. (Trial Tr. 7.)

In June 2015, Plaintiff saw an advertisement in the Herkimer Telegram which announced:

*Don & Larry*
PAINTING & CONTRACTING
Home Repair, Minor Remodeling, Wiring
Plumbing, Sheetrock Repair
Quality Work at Affordable Prices
40+ YEARS COMBINED EXPERIENCE
Competent > Professional > Trusted
Your job the way YOU want it
(315) 867-4409

(Ex. 1.) The forty plus years combined experience caught Plaintiff's attention and she called

Defendant to set up an appointment to discuss remodeling the Property. During the initial visit in

June 2015, Plaintiff testified that she told Defendant she did not want to move forward unless the

basement and foundation could support the remodeling project. According to Plaintiff, Defendant

indicated that Spencer was his partner and that Defendant wanted him to see the Property. Plaintiff

set up another meeting with both Defendant and Spencer and had them inspect the house and

basement. Plaintiff testified that Defendant informed her at that meeting that Spencer had the forty

years of experience in construction. (Trial Tr. 8-10.)

On June 23, 2015, Defendant emailed Plaintiff a proposal which included "two men,"

which Plaintiff understood to mean Defendant and Spencer. Plaintiff "transcribed" Defendant's

proposal, adding certain assumptions to make it a more "formal agreement," and emailed it as

amended to Defendant for signature. After adding a list of references to this document, Defendant

signed and returned the agreement to Plaintiff. Plaintiff signed the contract (the "Contract") on June 24, 2015. The Contract, as amended, provided that the project be completed "in [a] good and workmanlike manner," that there would be "no subcontractors," and the contractor would "procure all required permits in accordance with the law." Defendant was to be paid $3,904 in three installments, with the remodeling to start on June 29, 2015, and finish by August 30, 2015. Plaintiff testified Defendant never obtained any building permits for remodeling the Property. (Trial Tr. 10-13; Ex. 3.)

On August 7, 2015, the Parties signed "Addendum to Existing Contract or Phase 2" ("Addendum I") for additional work to be done for $13,560. It included installing plumbing for a kitchen sink, removing and building a new set of stairs, and building an office and a new closet. (Trial Tr. 14-15; Ex. 4) A second addendum ("Addendum II") dated April 18, 2016 and titled "Requested Proposal," lists additional work to be done by Defendant, includes a handwritten note that everything on the list was paid for, and is unsigned by either party. (Trial Tr. 15-16; Ex. 5.) Between June 2015 and June 2016, Plaintiff testified she paid Defendant a total of $38,136 by check or wire transfer. (Trial Tr. 17-20; Ex. 6, 7.) Regarding the Parties' transactions, Plaintiff testified that she was impressed by Spencer's forty years of experience in construction and his representation that he and Defendant could "do anything you want done." Plaintiff acknowledged that the Contract did not mention Spencer but instead only had language that "the contractor assumes all physical liability for himself and his work team." She further testified she did not visit the Property from June 2015 until May 2016 and therefore was unaware of who was doing the work on the Property during that time. (Trial Tr. 50-51; Ex. 3.) Plaintiff testified that it was her understanding that Spencer would be involved with the project even though the Contract was

signed solely by Defendant as "Don. W. Hall d/b/a/ Don's Painting & Remodeling Service." (Trial Tr. 52.)

Plaintiff testified that while receiving chemotherapy treatments at the Mayo Clinic in Florida, she scheduled a meeting with Defendant while he was on vacation in Florida. Defendant cancelled the meeting because he came down with the flu. Plaintiff scheduled a second meeting to take place at the Property sometime in May 2016. Plaintiff was "shocked [to see that] hardly anything had been done," and that many items had been removed but not replaced. (Trial Tr. 20-22.) Defendant agreed the remodeling would be finished by the end of June. The Parties scheduled another meeting for June 23, 2016, which Defendant did not attend because he was writing a grant that had a deadline. Plaintiff scheduled another meeting for July 22, 2016, which Defendant also did not attend. Plaintiff, together with her brother Michael Brennan, inspected the Property on that date, and her brother took pictures of the Property and called a local code enforcer to have the property inspected. (Trial Tr. 23-24; Ex. 9.) On July 22, Plaintiff observed that the siding was torn off, a door was recessed, the chimney had been removed, windows were broken, the insulation on the side of the Property was uneven, the door to the cellar had been removed and was covered with a drop cloth, and a chute had been constructed on the east side of the Property so Defendant could pour cement into the cellar. (Trial Tr. 25-27; Ex. 10, 14.) On the interior, Plaintiff observed that a total of twelve poles had been installed in the northeast corner of the foundation, but she was unsure which poles Defendant, her father, or a previous contractor had installed. (Trial Tr. 28.) In addition, old wiring had not been updated in the various rooms, a floor and wall had been removed in the living room, a set of stairs had been installed without a railing, the cellar door had been removed, insulation was incorrectly positioned, a sliding glass door had been installed without headers, and gaps existed between the cellar and first floor. (Trial Tr. 32-34; Ex. 11-13.)

On August 9, 2018, Michael Edwards, the Town of Fairfield code officer, inspected the Property with a colleague and Plaintiff present. After the inspection, Mr. Edwards sent Plaintiff an undated letter, listing ten violations and notifying Plaintiff the Property was not in compliance with the New York State construction code, and that the violations had to be addressed before further work could be done to the Property. (Trial Tr. 37-38, 57; Ex. 8.). Plaintiff then summarized her expenses to include the original $55,000 purchase price, the $39,000 paid to Defendant (which sum did not include a $900 check that she could not locate), $52,000 worth of furnishings and materials for the Property, including a new furnace, a sliding glass door, two vanities, one tub, one shower, new kitchen cupboards, a quartz countertop, plywood boards, cement, doors, and windows, as well $22,000 related to Property maintenance, taxes, and interest. Plaintiff testified she was not able to live in or rent the Property due to its then condition. (Trial Tr. 38-40.)

Plaintiff also testified that Defendant had instructed her to contract with Cranesville Cement Company ("Cranesville") and pay for two truckloads of cement. Because the first truckload of cement proved too loose, the second truckload delivered was never used. Plaintiff testified that Defendant told her not to pay for second shipment, which caused Cranesville to place a lien on the Property. According to Plaintiff, Defendant discussed his experience in rehabbing houses, and represented that the "forty plus years of combined experience" included Defendant and Spencer's work experience. Although the Contract referenced "two men" and Addendum I referenced "Larry and Don," Plaintiff did not realize that Spencer was not working on the project until the spring of 2016. (Trial Tr. 40-44.)

On cross-examination, Plaintiff testified that in 2014, she contacted two companies, Dolgeville Chimney ("Dolgeville") and "Branch," to have work done to the foundation and cellar walls. Branch provided Plaintiff with a $40,000 quote to replace the entire foundation. Plaintiff

did not accept this proposal. (Trial Tr. 48-49.) Instead, Plaintiff accepted Dolgeville's proposal of $7,500 to repair the northeast section of the foundation wall and install drainage pipes on the outside of the wall.

*Testimony of Plaintiff's Witness, Guy Donahoe*

Plaintiff's lay witness, Guy Donahoe ("Donahoe"), testified that he is a resident of Marcellus, New York and president of his practice, Donahoe Group. His educational background includes attending a technical college and receiving a degree from a school within the State University of New York ("SUNY") system, before going on to study at the Pratt Institute School of Design in Brooklyn, NY. Donahoe is a licensed architect and performs services involving code compliance, zoning approvals, construction administrations, and other architectural services, primarily for residential properties. (Trial Tr. 54-56.)

Donahoe first outlined the applicable construction codes at the time the Parties signed the Contract, including the 2015 International Residential Code, supplemented by New York State building standards and codes in the 2017 Uniform Code Supplement, among others. On December 27, 2018, Donahoe visited the Property with one of his employees to determine whether it was in compliance with New York State's construction code. He testified the exterior of the Property was "in a state of construction," which left some insulation exposed and some but not all windows and doors installed. He also testified that a portion of the foundation appeared to have existed before construction under the Contract began. He observed some separation between the block walls at the rear corner of the Property, which were not bonded. According to Donahoe, the stone and foundation walls waved in and out and did not align with the framing above it. Accordingly, they needed to be repaired before further work could be done. He testified a contractor would have advised an owner as to whether a licensed engineer or architect was needed to evaluate its condition

and advise the owner whether the building could support further remodeling and, if not, costs associated with fixing it. (Trial Tr. 57-60.)

With respect to the interior, Donahoe observed that the basement condition confirmed his observations made concerning the exterior of the Property. On the main floor, the new staircase did not meet local code requirements, some doors and windows had not been installed with adequate headers or jack studs, the front and rear patio doors were sitting on the plywood deck on the inside rather than on the exterior sills overhanging it, windows had not been weatherized properly, the wood had dry rot and had not been replaced, and that generally the interior was unfinished. (Trial Tr. 61-64.) On the second floor, Donahoe observed that the floor was "extremely spongy," and lacked structural support because a load-bearing wall had been removed, which removal would have required input from a structural engineer. (Trial Tr. 67-71.) In Donahoe's opinion, the repair and remodeling work had not been done in accordance with "good construction practice," the workmanship was "woefully inadequate and unacceptable," and the Property was unsafe generally. (Trial Tr. 64-65, 73, 75.) In Donohoe's estimation, it would be more economical to demolish the Property for approximately $15,000 than to remodel it. (Trial Tr. 74.)

*Testimony of Debtor-Defendant Hall*

Defendant testified on his own behalf that Plaintiff contacted him after seeing the advertisement "Don & Larry" in the Herkimer Evening Telegram, which advertisement had been printed in error. Instead, the "Don's Painting and Remodeling Services" advertisement published in the Newport Penny Saver was the correct advertisement. (Ex. 1.) Defendant testified he had forty-five years in writing grants as a consultant for the Department of Housing and Urban Development ("HUD") and municipalities specializing in housing rehabilitation and inspection of said properties for major deficiencies. In 2013, however, he started the painting and remodeling

9

business to provide his family with additional income. According to Defendant, Spencer ran his own construction company for forty years, and although they worked on small projects together that summer, they were never partners. (Trial Tr. 81-84.)

Initially, the Contract involved "just cosmetic" work. Defendant knew the project was "very simple" because he gave three code enforcement officers a copy of the Contract to see if he needed to procure any permits. Each officer told him a permit was not required for the work delineated in the Contract. Defendant remembered bringing Spencer to the Property because he "just wanted him to see it," and although Spencer was retired, Defendant thought they might work on the Property together. (Trial Tr. 82-83.) During his initial inspection of the Property, Defendant observed that the basement did not have electricity, and that he needed a flashlight to see. The basement was full of debris and discarded appliances, and the support beams installed by a previous contractor had deteriorated and fallen. Defendant testified that Plaintiff did not express that she only wanted to proceed with remodeling if the basement was structurally sound. Instead, Defendant recalled that her only comment was that she "[did not] want to spend a lot of money on this." Defendant also testified that the work in Addendum I was "quite involved," required him to hire "plenty of help," and that he did not discuss with Plaintiff who would be working with him on the project. Defendant did not have a chance to complete the project because Plaintiff sent him a certified letter in the summer of 2016 prohibiting him from returning to the Property. Defendant acknowledged that mistakes had been made and that he did not speak with any code enforcement officers after the initial three conversations with code officers. (Trial Tr. 84-87.)

On cross-examination, Defendant admitted the "Don & Larry" advertisement had been published in both the Newport Penny Saver and the Herkimer Telegram. Defendant purchased a one-month subscription in the Herkimer Telegram, with the advertisement to run for a 29-day

period on every Sunday in June 2015. (Trial Tr. 88-93.) Defendant confirmed having had multiple telephone calls with Plaintiff, but he did not recall discussing Spencer's forty years of experience with Plaintiff during the second visit. Regarding the forty plus years combined experience advertised in the Herkimer Telegram, although he and Spencer each had forty years of experience, Defendant could not say why the advertisement did not suggest eighty years of experience instead. Regarding the reference to "two men" in the Contract, Defendant stated Spencer was among the candidates he considered for the project, but that he eventually hired two workers named Anthony and Leo as independent contractors. Defendant testified that he did not intentionally withhold information from Plaintiff, and that most of his business records were with a prior attorney, Mr. Longeretta, with whom he had not spoken since 2019. (Trial Tr. 94-99.)

In response to questions regarding New York law including General Business Law, Defendant stated he used a standard contract which Plaintiff amended. Concerning Article 3 and Section 75 of the New York Lien Law, Defendant said he was not familiar with these statutes "off the top of [his] head." He also testified that at Plaintiff's request, he maintained an Excel Spreadsheet record of payments received and deposited into a checking account with Berkshire Bank, which had since closed but was used to pay his employees. (Trial Tr. 100-01.) Regarding Addendum I's reference to "Larry and Don," Defendant testified he included Spencer but that because of a disagreement they had, Spencer decided not to work on the project. (Trial Tr. 102-03; Ex. 4.) The disagreement centered over how and to what extent a twelve-foot drop between the front and back doors was to be repaired. (Trial Tr. 107.) Although Defendant knew Spencer did not want to be involved before the Contract was signed, Defendant had hoped he would change his mind. (Trial Tr. 102-07; Ex. 18.) Defendant did not advise Plaintiff that Spencer would not being working on the project because he did not think he had to. With respect to the three code

officials he contacted, Defendant testified that two of them individuals came from neighboring towns and, because the third individual lived across the street from Plaintiff, Defendant thought he was the local officer. Defendant acknowledged that he was mistaken about the identity of the local officer, that he never spoke with Donahoe, and that he failed to obtain a copy of the Town of Fairfield's building code. (Trial Tr. 108-09.)

Defendant testified he had several discussions with Plaintiff about additional work needed but because the Property had been vacant and left unheated for over ten years, the damage to it was not discovered until after the siding had been removed. Only then did Defendant realize the extent of the damage to the Property, which he brought to Plaintiff's attention. (Trial Tr. 110-11.) In addition, the project had to be done in stages due to cold weather and the lack of heat, and because he had to repair work done by previous contractors. (Trial Tr. 112-13.) Upon being questioned about Donahoe's testimony concerning the loadbearing wall which required an architect, Defendant testified he did not "know where [Mr. Donahoe] was coming from," because he did not move any walls but rather reinforced existing walls. Defendant acknowledged that, depending on where a load bearing wall is located, if it impacted the safety or integrity of the structure, the input of an architect or engineer was required. Finally, Defendant testified that it was Leo and Anthony, the independent contractors, who installed the stairs after Plaintiff prohibited Defendant from reentering the property. (Trial Tr. 114-15.)

## ARGUMENTS

Plaintiff alleges she carried her burden under § 523(a)(2) for the following reasons. (ECF Adv. No. 42.) First, Plaintiff asserts Defendant engaged in false pretenses by creating and fostering a false impression that he had the credentials and experience to do the work he was hired to do, that Spencer would be part of the team and that Defendant would procure permits as required by

the various New York State construction codes. Plaintiff asks this Court to find Defendant's conduct was part of a scheme to knowingly defraud and mislead her by creating these false impressions. Plaintiff also asserts that Defendant falsely represented the condition of the foundation wall, which representation she relied on causing her to expend $39,036 to her detriment. Finally, Plaintiff asserts that before the Parties signed the Contract, Defendant engaged in actual fraud by making statements he knew were "necessarily [and] knowingly false," and by failing to advance material facts to negate his fraudulent conduct. Plaintiff argues that based on the circumstances surrounding the Parties' initial communications and Defendant's course of conduct, Defendant intended to defraud her. Plaintiff avers she reasonably relied upon Defendant's alleged experience and false representations that the project was progressing, causing her to pay Defendant to her detriment. Accordingly, Plaintiff argues the burden of proof shifted to the Defendant.

Defendant in turn argues Plaintiff failed to meet her burden of proof by the preponderance of evidence as required under § 523(a)(2)(A). Defendant argues Plaintiff's allegation of false pretenses must fail because, although she allegedly relied on the "Don & Larry" advertisement printed in the Herkimer Telegram and the other references to Spencer, she and Defendant were the only parties to the Contract. Second, Defendant asserts Plaintiff failed to prove the elements of false representation because she failed to establish Defendant knowingly or willingly intended to deceive Plaintiff by making an express or misleading statement regarding his credentials and Spencer's involvement in the project. Finally, Defendant argues that Plaintiff's claim for actual fraud must fail because she failed prove Defendant knew that his representations were false at the time they were made, and that the alleged misrepresentations caused Plaintiff to sign the Contract with Defendant. In sum, Defendant argues that the record establishes Defendant had over forty years of experience in writing grants, and that because the Contract was only signed in his name

without reference to Spencer, Plaintiff failed to carry her burden of proving false pretenses, false representation, or actual fraud because she failed to prove Defendant's intent, the key element for all three categories under § 523(a)(2)(A). Therefore, the burden never shifted to Defendant, and the relationship between the parties was merely one of breach of contract, which is not an exception to discharge under § 523(a)(2).

## **DISCUSSION**

At the close of evidence, Defendant moved to dismiss this action on the ground that Plaintiff failed to demonstrate a right to relief under § 523(a)(2)(A). Although Defendant did not provide a basis for his motion, in a bench trial the appropriate vehicle for dismissing a case as a matter of law due to Plaintiff's insufficient evidentiary showing is a motion under Federal Rule of Civil Procedure 52(c), made applicable to this proceeding through Federal Rule of Bankruptcy Procedure 7052, which authorizes the Court to enter judgment at any time the Court can make a dispositive finding on the evidence. FED. R. CIV. P. 52(c); FED. R. BANKR. P. 7052. Because the Court reserved on the motion until the close of all the evidence, its decision will operate as an adjudication on the merits.

The primary purpose of bankruptcy is to grant a fresh start to the honest but unfortunate debtor by relieving the debtor from the weight of oppressive indebtedness. *Grow Up Japan, Inc. v. Yoshida (In re Yoshida)*, 435 B.R. 102, 107 (Bankr. E.D.N.Y. 2010) (citing *Grogan v. Garner*, 498 U.S. 279, 286-87, 111 S. Ct. 654, 112 L. Ed. 2d 755 (1991)). Equally important is preventing a dishonest "debtor's attempts to use the law's protections to shield his or her wrongdoing." *McDonald v. Dunnett (In re Dunnett)*, 2013 Bankr. LEXIS 2244, at *25 (Bankr. N.D.N.Y. May 29, 2013) (citing *Kuper v. Spar (In re Spar)*, 176 B.R. 321, 326 (Bankr. S.D.N.Y. 1994) (quoting *In re Newmark*, 20 B.R. 842, 852 (Bankr. E.D.N.Y. 1982))). To except a debt from discharge under

14

§ 523(a)(2)(A), the creditor bears the burden of proving, by a preponderance of the evidence, that the debt falls within one of its three exceptions. *Reddy v. Melnik* (*In re Melnik*), 592 B.R. 9, 21 (Bankr. N.D.N.Y. 2018), *aff'd*, 2021 U.S. App. LEXIS 37363 (2d Cir. 2021) (citing *Grogan*, 498 U.S. at 286-91). This means the creditor bears the ultimate burden to present sufficient evidence to persuade the finder of fact that the proposition is more likely true than not. *Melnik*, 592 B.R. at 19 (citing *FDIC v. Bacino (In re Bacino)*, 2014 Bankr. LEXIS 894, at *25 (Bankr. S.D. Ca. Feb. 28, 2014)). In deciding whether a debt is excepted from discharge, a bankruptcy court must construe the evidence strictly against the creditor and liberally in favor of the debtor. *Melnik*, 592 B.R. at 21 (citing *Signature Bank v. Banayan (In re Banayan)*, 468 B.R. 542, 573 n.285 (Bankr. N.D.N.Y. 2012) (citing *Geiger v. Kawaauhau (In re Geiger)*, 113 F.3d 848, 853 (8th Cir. 1997), *aff'd*, 521 U.S. 1153 (1997) (citations omitted)). Once a creditor establishes a *prima facie* case of fraud, the burden shifts and the debtor must prove or provide some explanation of the alleged fraud. *In re Dunnett*, 2013 Bankr. LEXIS 2244, at *26-27.

Section 523(a)(2)(A) excepts from discharge any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." 11 U.S.C. § 523(a)(2)(A). "To be actionable the debtor's conduct must involve moral turpitude or intentional wrong; mere negligence, poor business judgment or fraud implied in law (which may exist without imputation of bad faith or immorality) is insufficient." *Melnik*, 592 B.R. at 21 (citing *Straight Line, LLC v. Madigan (In re Madigan)*, 2018 Bankr. LEXIS 1394, at *25 (Bankr. N.D.N.Y. May 8, 2018) (quoting *In re Schwartz & Meyers*, 130 B.R. 416, 422 (Bankr. S.D.N.Y. 1991) (citing 3 L. King, COLLIER ON BANKRUPTCY, ¶ 523.08 at 523-24 (15th ed. 1990))). Although § 523(a)(2)(A) includes three types of fraud with slightly different meanings,

the Supreme Court "has historically construed the terms in § 523(a)(2)(A) to contain the elements that the common law has defined them to include." *Husky Int'l Elecs., Inc. v. Ritz*, 578 U.S. 355, 360 (2016) (internal quotation marks omitted). Since each type of fraud enumerated in § 523(a)(2)(A) has a specific meaning, each type must be analyzed individually according to the facts of the particular case. *Melnik*, 592 B.R. at 21 (citing *Argento v. Cahill (In re Cahill)*, 2017 Bankr. LEXIS 501, at *14 (Bankr. E.D.N.Y. Feb. 22, 2017) (citing *Husky*, 578 U.S. at 360)). A party "can satisfy the elements of § 523(a)(2)(A) by establishing only one of the three types of fraud." *Indo-Med Commodities, Inc. v. Wisell (In re Wisell)*, 494 B.R. 23, 35 (Bankr. E.D.N.Y. 2011).

For purposes of § 523(a)(2)(A), the term "false pretenses" means "conscious, deceptive, or misleading conduct calculated to obtain or deprive another of property." *Melnick*, 592 B.R. at 21 (citing *Banayan*, 468 B.R. at 574 n.293). False pretenses may be implied based on an implied misrepresentation or silence in the face of a duty to disclose material facts on which a transaction depends. *Id*. (citing *Banayan*, 468 B.R. at 565 n.195 (citing *Farraj v. Soliz (In re Soliz)*, 201 B.R 363, 369 (Bankr. S.D.N.Y. 1996) (collecting cases))); *see also*, *DeWitt v. Stewart (In re Stewart)*, 948 F.3d 509, 520 (1st Cir. 2020) (citing *Privitera v. Curran (In re Curran)*, 855 F.3d 19, 28-29 (1st Cir. 2017) (quoting *Old Republic Nat'l Title Ins. Co. v. Levasseur (In re Levasseur)*, 737 F.3d 814, 818 (1st Cir. 2013)) (false pretenses may "arise when the circumstances imply a particular set of facts, and one party knows the facts to be otherwise, but does not correct the counter-party's false impression.") (internal quotation marks omitted)). Thus, to prove fraudulent conduct under § 523(A)(2)(A), a creditor must prove actual fraud, rather than fraud implied in law, which may be inferred from the totality of circumstances. *McDunnett*, 2013 Bankr. LEXIS 2244, at *30.

The elements required to establish a debt as non-dischargeable under false pretenses are: (1) an implied misrepresentation or conduct by the debtor; (2) promoted knowingly and willingly; (3) to create a contrived or misleading understanding of the transaction on the part of the creditor; (4) which wrongfully induced the creditor to advance money, property, or credit to the debtor. *Melnick*, 592 B.R. at *21 (citing *Banayan*, 468 B.R. at 574 n.292 (citing *Scheidelman v. Henderson (In re Henderson)*, 423 B.R. 598, 621 (Bankr. N.D.N.Y. 2010) (citations omitted)).

Similarly, to make out a claim for false representation, the plaintiff must prove by a preponderance of the evidence that the debtor: (1) made a knowingly false misrepresentation; (2) with the intent to deceive, (3) on which the creditor justifiably relied; (4) in order to induce the creditor to turn over money or property to the debtor. *Banayan*, 468 B.R. at 574 (citing *Henderson*, 423 B.R. at 621 (citations omitted)). "The element distinguishing a false representation from a false pretense is an explicit, definable statement by a debtor that results in a misrepresentation. A false pretense, on the other hand is conduct by the debtor that implies or promotes a scheme that is misleading." *Melnick*, 592 B.R. at 21 (citing *Cahill*, 2017 Bankr. LEXIS 501, at *16-17).

Finally, a debt may be excepted from discharge under § 523(a)(2)(A) on the basis of actual fraud, which now includes types of fraud beyond frauds based on a misrepresentation. *Melnick*, 592 B.R. at 26 (citing *Husky*, 578 U.S. at 360). The Supreme Court defined actual fraud in *Husky* as "anything that counts as 'fraud' and is done with wrongful intent." *Husky*, 578 U.S. at 360; *see also*, *Banayan*, 468 B.R. at 576 (quoting *Silverman v. K.E.R.U. Realty Corp. (In re Allou Distrib.)*, 379 B.R. 5, 34 (Bankr. E.D.N.Y. 2007) (Actual fraud encompasses "any deceit, artifice, trick, or design involving direct and active operation of the mine, used to circumvent and cheat another.")). Although *Husky* expanded the definition of actual fraud to include more than fraud based on misrepresentation, the Supreme Court made clear that "actual fraud" also encompasses fraudulent

inducement based on a misrepresentation. *Husky*, 578 U.S. at 361. In the Second Circuit, actual fraud based on a misrepresentation still requires "a false representation, scienter, reliance and harm." *Evans v. Ottimo*, 469 F.3d 278, 283 (2d. Cir. 2006) (citing Restatement (Second) of Torts § 525; *Field v. Mans*, 516 U.S. 59, 70 n.9 (1995) (stating that the terms of the Bankruptcy Code's fraud exception to discharge are to be construed to incorporate the general common law of torts, under the dominant consensus of common law jurisdictions, rather than under the law of a particular state).

To establish a claim for actual fraud, which means common law fraud, a plaintiff must prove the following five elements: (1) debtor made a material false representation; (2) scienter, in which debtor made the representation knowing of its falsity; (3) debtor's intent to deceive plaintiff; (4) the creditor's justifiable reliance on the false representation; and (5) the creditor's damage as a result. *Banayan*, 468 B.R. at 576 (citing *Henderson*, 423 B.R. at 621) (citations omitted).

Despite the distinctions between the three types of fraud in § 523(a)(2)(A), some of the underlying elements overlap. *Husky*, 578 U.S. at 363; *see also*, *Cahill*, 2017 Bankr. LEXIS 501, at *17. The common elements of a fraud based on misrepresentation are the debtor's intent, the creditor's reliance, and causation. *Field*, 516 U.S. at 68. "The most difficult element inherent in any fraud theory is proving what the defendant actually intended at the time of the questioned transaction." *McDunnett*, 2013 Bankr. LEXIS 2244, at *34 (quoting *Huggins v. Skinner (In re Skinner)*, 2012 Bankr. LEXIS 5782, at *5 (Bankr. D. Ariz. Dec. 13, 2012)). Since direct proof of a debtor's subjective state of mind is generally unavailable, a debtor's knowledge and intent may be inferred from the totality of circumstances, including a reckless disregard for the truth or falsity of the statements. *Id.* at *34 (citing *Nat'l Union Fire Ins. Co. v. Bonnanzio (In re Bonnanzio)*, 91 F.3d 296, 301-02 (2d Cir. 1996) (citing *In re Bossard*, 74 B.R. 730, 737 (Bankr. N.D.N.Y. 1987)

(Circumstantial evidence may include the level of experience and financial sophistication of the debtor)).

For purposes of § 523(a)(2)(A) actions, the Supreme Court had held that the justifiable reliance standard applies. *Field*, 516 U.S. at 74-75. While the creditor is not initially required to conduct an examination or investigation under the justifiable standard, depending on the creditor's knowledge and intelligence, the facts and surrounding circumstances should be apparent to the creditor if the creditor discovered something that should serve as a warning that he is being deceived. Consequently, the creditor is "required to use his senses, and cannot recover if he blindly relies upon a misrepresentation of falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation." *Id*. at 70-72 (citing W. Prosser, Law of Torts § 108 p.718 (4th ed. 1971)). Accordingly, the creditor must prove by the preponderance actual and justifiable reliance; "the greater the distance between the reliance claimed and the limits of the reasonableness, the greater the doubt about reliance in fact." *Id.* at 76; *accord*, *Cahill*, 2017 Bankr. LEXIS 501, at *19-20.

"Fundamental to any claim under § 523(a)(2)(A) is the occurrence of some misrepresentation." *FCC Nat'l Bank v. Lokotnicki*, 232 B.R. 583, 587 (Bankr. W.D.N.Y. 1999). Contractor-debtor cases generally prove fraud or misrepresentation in one of two ways. First, by showing that the debtor signed the contract with the intent of never complying with the terms. Second, by showing that there was an intentional misrepresentation as to a material fact or qualification when soliciting or obtaining the work. *Henderson*, 423 B.R. at 605. For a breach of contract to result in a non-dischargeable debt, the debtor must have misrepresented his or her intention to perform contractual duties, which may be inferred if the debtor failed to begin performance. *Id*. at 605. To determine whether a contractor committed fraud in connection with a

construction project, the analysis pivots on whether during the negotiations the contractor induced the property owner into signing the contract by making material, false representations, such as promising to obtain the necessary permits or by overstating his qualifications. *Id*. Substandard performance or poor quality of work, without more, merely give rise to a breach of the construction contract, which is not sufficient to constitute a fraud necessary to except the debt from discharge. *Id*. The creditor must prove scienter with evidence of either actual intent or a reckless disregard for the truth at the time of the questioned transaction.

Plaintiff seeks to have her debt deemed non-dischargeable pursuant to § 523(a)(2)(A) under each of its three categories. Plaintiff did not allege Defendant did not perform under the Contract or Addendum I. Given how the facts and circumstances unfolded in this case, however, the Court will address the common elements of misrepresentation under § 523(a)(2)(A) which are Defendant's intent, Plaintiff's reliance, and causation. Relevant to each type of fraud is the alleged misrepresentations made by Defendant during the Parties' negotiations and at the inception of the Contract and Addendum I.[2] First, Plaintiff argues that Defendant created and fostered a false impression that he had the credentials and experience to do the work he was hired to do. In support of this contention, she points to Donahoe's testimony that the workmanship done at the Property was "woefully inadequate and unacceptable." (Trial Tr. 73, 75.) Notwithstanding the condition of the Property, the record reflects that Plaintiff was well-aware of Defendant's qualifications when she hired him. Plaintiff testified that after she "made the Contract more formal," the only addition Defendant made was to add his eight references. The first reference listed clarifies that Defendant spent "40 years rehabbing over 700 units" under the named individual's supervision. The forty years of rehabbing, along with the remaining seven references, demonstrate Defendant was

---

[2] The Court will not consider any arguments related to the unsigned Addendum II, as it does not constitute a contract between the Parties.

competent to do minor repair work to the Property. The forty plus years combined experience and list of services provided in the Herkimer Telegram advertisement provide additional support that Defendant had the ability to do minor remodeling at the Property. Without identifying which references, Plaintiff testified she called only three of Defendant's references before she signed the Contract. The Court infers from Plaintiff's own testimony that she was satisfied with Defendant's ability to perform under the Contract and Addendum I and concludes that Defendant did not misrepresent his credentials.

Next, Plaintiff avers that Defendant falsely represented that he would obtain the necessary permits required by the applicable construction codes. However, Defendant did not misrepresent that he would obtain the necessary permits. Instead, he agreed to this provision added by Plaintiff as a requirement of the Contract. Defendant's failure to obtain permits is a perhaps a breach of the Contract and Addendum I, but it is not the result of Defendant knowingly making a false representation with an intent to deceive Plaintiff.

Plaintiff further alleges Defendant falsely represented the integrity of the foundation, wall, and basement. However, Plaintiff testified that prior to contracting with Defendant, sometime in 2014 she sought two proposals for repair work to the foundation and wall from two contactors. The price range between the two estimates was significant – one was for $40,000, the second for $7,500. On cross-examination, Plaintiff acknowledged the more expensive bid proposed replacing the entire foundation. Plaintiff, however, chose to go with the less expensive bid, which involved repairing just the northeast wall of the foundation and inserting drainage pipes outside the wall. Notably, Donahoe credibly testified that the poor condition of both the foundation and the wall were attributable to work done by a prior contractor. Defendant in turn testified that he did not recall discussing the foundation with Plaintiff, but only that she indicated that she did not want to

spend a substantial amount of money on the project. The Contract itself provides only that Defendant "fill and patch" the block wall and the "significant" opening in the rear of the Property. Based on the Parties' and Donahoe's testimony at trial, the Court finds Defendant's testimony regarding these particular facts and circumstances credible, especially given it was Plaintiff who was aware, based on the expensive quote, that the condition of the foundation was an issue and that it likely impacted the structural integrity of the Property. Accordingly, the Court finds that Plaintiff failed to prove by the preponderance of the evidence that Defendant misrepresented his credentials, misrepresented that he would obtain the permits, or misrepresented the integrity of the foundation or wall. Therefore, the Court need not address the common elements of justifiable reliance and intent as these elements relate to those allegations.

More difficult to address are Plaintiff's allegations and the Parties' competing testimony regarding Spencer. Plaintiff alleges that by including Spencer's name in the Herkimer Telegram advertisement, by making the reference to "two men" in the Contract and "2 men (Don and Larry)" in Addendum I, Defendant misrepresented Spencer's involvement in the Project. Whether overtly or by omission, these references imply that Spencer would be working on the project with Defendant. Moreover, on cross-examination, Defendant testified that he knew that Spencer did not want to work on the project before the Parties even signed the Contract. While this begs the question why Defendant made any references to Spencer, on cross-examination Defendant credibly explained that he thought Spencer would change his mind. The decisive question then, is whether Defendant's representations were made with the requisite intent to defraud Plaintiff. Based on the surrounding facts and circumstances of this case, the Court concludes they were not for the following reasons.

First, the Court will turn its attention to Plaintiff's claim that she was justified in relying on Spencer's involvement. Plaintiff testified that Defendant told her at the initial meeting that Spencer had the forty years of experience in construction. She further testified Spencer told her that he and Defendant "could do anything you want done" at the second meeting. According to Plaintiff, these two conversations left her with the impression that Spencer would be working on the project. Preliminarily, this Court previously concluded that Plaintiff knew Defendant had enough experience for Plaintiff to feel comfortable signing the Contract and Addendum I solely with Defendant. More importantly, it was Spencer, rather than Defendant, who allegedly made the representation to Plaintiff at the second meeting that they had ability to perform under the Contract. Section 523(a)(2)(A) requires the defendant make the false representation, and so Spencer's remarks to Plaintiff are immaterial. While Defendant's failure to correct the record at this time could potentially represent an instance where Defendant was silent when he had a duty to disclose material facts, this still does not give rise to fraudulent conduct. Defendant credibly stated that he was holding out hope that Spencer would join the project at this time, and so if he heard Spencer's comment, would likely have taken it as evidence of Spencer's reignited interest in working with Defendant. Accordingly, Defendant lacked the intent to deceive Plaintiff through silence. Finally, nothing in evidence suggests there was any contact between Spencer and Plaintiff after that meeting. Notwithstanding Defendant's representations implying that Spencer would be involved in the project, Plaintiff formalized the Contract herself and subsequently signed it with "Don W. Hall dba Don's Painting and Remodeling Service." She did not contract with "Don and Larry" or any business involving the two men. If Spencer's experience was as critical to Plaintiff's decision to contract with Defendant as she advances, Defendant's purported misrepresentations concerning his involvement in the project should have alerted her that she was being deceived.

Instead, Plaintiff communicated exclusively with Defendant, signed the Contract and Addendum I solely with Defendant, and made all payments directly to Defendant during the Parties' business relationship. Taking into account the respective professional and educational backgrounds of the Parties, the Court declines to give more credence than Plaintiff did to Spencer's involvement in the project. As such, the Court finds that Plaintiff's reliance on Spencer's involvement was not justified.

Moreover, and most importantly, these facts and circumstances and the testimony elicited at the hearing do not support Plaintiff's allegations that Defendant harbored an intent to defraud Plaintiff. For the reasons stated above, the Court dismisses Plaintiff's § 523(a)(2) action in its entirety.

## **CONCLUSION**

While it is unfortunate that Defendant's performance rendered the Property in worse condition than it was in before the Parties met, poor quality of work without more constitutes a breach of the Contract and Addendum I. Because the Court must construe the evidence strictly against Plaintiff and liberally in Defendant's favor, the Court concludes that Plaintiff failed to meet her burden to establish the debt owed her is non-dischargeable under § 523(a)(2). A separate order shall be entered pursuant to Federal Rule of Bankruptcy Procedure 9021.

###